**Frank GOUDLOCK, Petitioner-Appellee,**

v.

**R.C. MARSHALL,
Respondent-Appellant.**

**No. 83–3860.**

United States Court of Appeals,
Sixth Circuit.

Argued July 31, 1984.

Decided Jan. 9, 1985.

Richard David Drake, Asst. Atty. Gen. (argued), Columbus, Ohio, for respondent-appellant.

Jill Stone, Public Defender (argued), Columbus, Ohio, for petitioner-appellee.

Before EDWARDS, Circuit Judge, BROWN, Senior Circuit Judge, and DOWD, District Judge.[*]

DOWD, District Judge.

This is an appeal by the Superintendent of an Ohio Correctional Facility from the

---

[*] The Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio, sitting by designation.

granting of the appellee Frank Goudlock's petition for writ of habeas corpus filed in the Southern District of Ohio.

On December 21, 1977, the petitioner-appellee Goudlock was sentenced to two terms of life imprisonment for aggravated murder following a jury trial. After exhaustion of state remedies, a petition for writ of habeas corpus was filed and granted in the Southern District of Ohio.

An appeal was taken to this Court and the judgment of the district court was vacated and the case remanded for further consideration in light of subsequent pronouncements by the United States Supreme Court respecting the application of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *See Goudlock v. Marshall,* 712 F.2d 238 (6th Cir.1983).

Upon remand, the district court again granted the writ of habeas corpus and again an appeal was taken by the respondent-appellant Marshall.

The pivotal issue is whether the cross-examination of the petitioner regarding the timing of his initial revelation of his exculpatory explanation for the presence of his fingerprints in a 1975 Chrysler owned by one of the two homicide victims violates the mandate and spirit of *Doyle v. Ohio, supra.*

### THEORY OF THE DOYLE RULE

*Doyle v. Ohio* and its progeny teach that an effort by the prosecution to impeach or discredit an exculpatory explanation of-fered by a testifying defendant at trial by questioning or suggesting that the defendant should have stated or offered the exculpatory explanation upon arrest, or confrontation, or interrogation by the police violates *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Summarized, post *Miranda* warning silence by the defendant shall not be used to impeach or discredit an exculpatory explanation offered by the defendant at trial.[1]

### SUMMARY OF THE PROSECUTION'S CASE.

The two homicide victims, Hite and Russell, were discovered by chance in separate locations in Cleveland, Ohio. Hite, still alive, was discovered near midnight on Tuesday, March 8, 1977, and was dead upon arrival at a hospital. Russell's body was discovered after daybreak on March 9, 1977.

Hite, a white male, age 20, was abducted as he returned to his automobile parked on Harvard Avenue in Cleveland. Russell was a black male, age 64.[2] Hite and Russell were each shot once in the back of the head by the same .38 caliber revolver subsequently recovered and identified as the weapon firing the two fatal bullets. Hite, the first victim, was promptly identified. Russell, a widower living alone, was not identified for several days until a friend, aware of Russell's disappearance, went to the county morgue and identified his body.[3]

---

1. The holding of *Doyle* was subsequently limited by the Supreme Court in two cases. In *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) the Court held it is not a *Doyle* violation to impeach a defendant offering exculpatory testimony at trial with an inconsistent account of events previously given to investigating officers. The Court held further in *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) that a defendant offering exculpatory testimony at trial may be impeached with his silence at the time of his arrest if *Miranda* warnings were not given. The teaching of *Anderson* and *Fletcher* is that *Doyle* only disallows the impeachment of a defendant with *post-Miranda* warnings silence.

2. The record does not disclose any details about the location of Russell's abduction. Erwin, the government's chief witness, indicated that when he first met the petitioner on the evening of March 8, when the homicides occurred, the petitioner was driving an automobile which, according to the prosecution's version of the case, was Russell's 1975 Chrysler and Russell, alive, was locked in the trunk of the Chrysler.

3. Russell was identified by Charles Taylor a former fellow worker for New York Central. Taylor stated that Russell was a widower, lived alone, and drove a green 1975 Chrysler. Taylor apparently made the identification of Russell at the county morgue on Sunday, March 13, 1977. (R. 62–67 and 216)

Under an unusual set of circumstances,[4] Hite's stolen car, a 1972 Pinto, was recovered along with the murder weapon. Erwin and Davis, two other persons involved in the homicides, were arrested and in custody by the early morning hours of March 9, 1977, before Russell's body or the fact of his homicide was known. Erwin and Davis, while in custody and by inference, implicated the petitioner as a third person involved in the two homicides. As a consequence of that information and an anonymous phone tip to the police department, the petitioner was requested through his mother to come to the police station on the afternoon of March 10. Petitioner appeared at the police station at approximately 6:00 p.m., was taken into custody and subsequently transported to juvenile detention facilities as he was a juvenile, age 16. As subsequent events determined, Russell was also driving an automobile, i.e., a 1975 Chrysler on March 8, 1977.

However, that fact and the location of the Chrysler were unknown to the authorities on the date of the petitioner's arrest. Moreover, Erwin, who provided the investigating officers with information about the petitioner's involvement in the homicides, had mistakenly identified Russell's automobile as a Buick.[5] Subsequently, Russell was identified and his 1975 Chrysler was impounded [6] from its location at 9600 Bessemer, the same street where the petitioner

lived. A subsequent fingerprint analysis developed the fact that the petitioner had been inside Russell's 1975 Chrysler and, by inference, seated in the driver's seat.

Erwin testified as a government witness and identified the petitioner as having appeared early in the evening on March 8, 1977 in the 1975 Chrysler. Erwin, Davis and the petitioner drove about the city of Cleveland from one location to another and during that drive, it became apparent to Erwin that there was a male person in the trunk of the Chrysler. Davis was provided a weapon during this time frame by the petitioner. Subsequently Davis instructed the petitioner to stop the Chrysler while they were driving on Harvard Avenue. Davis departed from the Chrysler and with gun drawn, confronted Hite. Davis made Hite enter Hite's 1972 Pinto and then the two vehicles, the Chrysler and the Pinto were driven to a school yard where Hite was transferred to the trunk of his car. Then the two vehicles drove around and finally stopped at Woodhill Park. Russell was removed from the Chrysler and marched away by Davis and the petitioner and shot. (R-82) Erwin, Davis and the petitioner then resumed driving around Cleveland making a number of stops before returning to Woodhill Park where Hite was taken from the trunk of his Pinto and shot. (R 83-85). After the second killing, Davis

---

4. Phillip Sidel and Frank Waters, working as armed plainclothesmen for RTA (Regional Transit Authority) security, were on a stakeout in Cleveland on the evening of March 8, 1977. While on the stakeout, they observed a hit-skip accident, gave chase and eventually became stalled in the mud at East 55th Street under the southbound I-77 overpass. At that point, Erwin and Davis were involved in a single car accident while driving Hite's stolen Pinto on the I-77 bridge located above Sidel and Waters' location where their automobile was struck. Sidel and Waters responded to the crash scene. They became suspicious of Erwin and Davis and held them at gunpoint until officers of the Cleveland Police Department arrived. The murder weapon was discovered on the ground near Hite's Pinto. (R-152-158 and R-165-171.)

5. In his statement to the police, Erwin described the vehicle as a Buick LeSabre (R-124.) At trial, on direct examination, Erwin described

the vehicle as a 1975 Chrysler and subsequently indicated that he had been shown the Chrysler in the police impound lot and determined it was the automobile the petitioner was driving on March 8 because of various materials in the front seat, including an empty Kools cigarette package. (R-88)

6. The 1975 Chrysler was processed for fingerprints by Detective Mell of the Cleveland Police Department Scientific Investigation Unit on March 15 at the police impound lot. (R-186) On cross-examination, Mell indicated, apparently reading from a report, that the Chrysler was towed from 9600 Bessemer on March 12 at 9:30 a.m. The defendant lived in the residence located at 9612 Bessemer. The record is silent as to why the vehicle was towed or whether, at the time the vehicle was towed, the investigating offices knew the vehicle related, in any way, to the victim Russell who had not yet been identified.

and Erwin continued to drive about Cleveland until the accident (R–86) that resulted in their arrest and the recovery of the murder weapon.

Erwin's damaging testimony concerning the petitioner and the presence of the petitioner's fingerprints in Russell's 1975 Chrysler constituted the prosecution's case in connecting the petitioner with the two homicides.

The prosecution offered no testimony on the subject of an interrogation of the petitioner nor did the prosecution offer any statements made by the petitioner to the investigating officers following his arrest on March 10, 1977.

When the prosecution rested its case in chief, the state of the evidence then before the jury with respect to the defendant's involvement from a chronological standpoint consisted of the following in summary form:

March 8:

The travel of the petitioner, Davis and Erwin, to various locations in Cleveland in an automobile driven by the petitioner with a male located in the trunk of the automobile.

The providing of a weapon by the petitioner to Davis.

The subsequent robbery and kidnapping of Hite in Hite's 1972 Pinto on Harvard Avenue while the petitioner remained in the automobile in which he initially appeared, i.e., the Chrysler.

The two car movement in tandem of Hite's 1972 Pinto and Russell's 1975 Chrysler about the streets of Cleveland, and the subsequent separate killings of Hite and Russell on the evening of March 8, 1977.

The early morning hours of March 9:

The report of the discovery of an injured person in the Woodhill Park area, i.e., Hite at 12:10 a.m., and the subsequent removal of Hite by ambulance to the hospital where he was pronounced dead.

The contacting of Hite's relatives and the determination that Hite's 1972 Pinto was missing from in front of the Hite apartment on Harvard Avenue.

The accident of Erwin and Davis in Hite's 1972 Pinto on Interstate 77 at the E. 55th overpass and its discovery by Phillip Sidel and Frank Waters, plainclothes security officers with RTA.

The announcement on the Cleveland Police Department radio of the 1972 Pinto accident and the subsequent arrival of the Hite homicide investigation officers, Donald Valerdo and Robert Sharkland, at the Davis-Erwin accident scene and the discovery of the .38 caliber murder weapon lying adjacent to the Pinto.

March 9 after day break:

The discovery of Russell's body at approximately 7:15 a.m.

The subsequent autopsies of Russell and Hite.

March 10:

The appearance of the petitioner at the Cleveland Police Department at approximately 6:00 p.m. following a request made to his mother that he be brought to the station.

The appearance of the petitioner in a lineup and his identification by Davis.[7]

March 12:

The impounding of Russell's 1975 Chrysler from its location at 9600 Bessemer Street in Cleveland.

March 13:

The identification of Russell at the County morgue.

March 15:

The search for latent fingerprints in the Russell 1975 Chrysler previously impounded.

---

7. On cross-examination, prosecution witness detective Farmer of the Cleveland Police Department, testified that the police received an anonymous phone call bringing in the petitioner's name prior to the time he was requested to come to the police station. Farmer further related on cross-examination that at a lineup conducted on March 10, the petitioner was identified by Davis. (R 223)

## THE DEFENSE CASE

The defendant offered testimony that he was driving a Ford LTD on the evening of March 8, 1977, when he met Erwin and Davis and drove about Cleveland. The defendant testified that the Ford LTD was loaned to him by Stella Harris, the granddaughter of the owner of the Ford. Stella Harris and her grandmother testified as defense witnesses and tended to corroborate the defendant's testimony.

On direct examination, the defendant confirmed the involvement of Davis in the robbery of Hite, admitting that Davis and Erwin were riding with him in the Ford LTD when Davis ordered the petitioner to stop at which point Davis while armed, confronted Hite. The petitioner testified that he became scared and left as an apparent robbery unfolded. The petitioner volunteered on direct examination that he did not tell the police about his observations as to the Hite robbery.[8] The defendant denied any knowledge about Russell or either homicide.

Additionally, the Defendant, in his exculpatory explanation respecting his fingerprints in the 1975 Chrysler, stated that he had seen the 1975 Chrysler parked on Bessemer close to his residence at 9612 Bessemer and that on the early afternoon of March 10 he entered the Chrysler and looked around it. Thereafter, he returned home and learned that the police were looking for him. He then reported to the police station.

On cross examination, the petitioner indicated he was held at the police station for only a 15 or 20 minute period before he was transported to a juvenile detention home. It is apparent from the defendant's testimony that his only contact with investigating officers was during that 15 or 20 minute period at the police station. The following colloquy on cross-examination which supports a finding that the defendant was advised of his *Miranda* rights on the 10th of March, but not confronted about the 1975 Chrysler, follows:

Q. Okay. Now, when you got downtown where did you and your mother go?

A. To the Justice Center.

Q. This building, this complex that we are in right now?

A. I know it's just built, on the detective floor.

Q. How long did you remain here?

A. Just long enough for a police car to come and get me to take me to Juvenile Detention Home.

Q. How long was that?

A. I didn't have on my watch.

Q. You didn't have a watch on?

A. No.

Q. Well, was it five minutes, more than five minutes?

A. About fifteen or twenty minutes.

Q. And did you talk to anyone during this fifteen or twenty minute period?

A. The detective was talking to me.

Q. What did he say to you?

A. He told me I got a right to remain silent, anything I say will be used against me, and he told me that I was implicated in a homicide.

Q. How were you implicated?

A. He said that my name came up in a conversation.

Q. Conversation with whom?

A. I don't know whom.

Q. That's all he told you?

A. Yes.

Q. And that was the extent of the conversation?

A. I beg your pardon?

Q. That was it, then he just took you over to the Detention Home?

A. Yes.

Q. You told them you didn't know anything about it period?

A. Yes.

Q. Nothing else was said?

A. Nothing else was said.

---

**8.** On cross-examination, the petitioner testified that after he witnessed the Hite robbery, he returned home and gave the girl the car and stayed home. The petitioner then replied in the negative to the question, "did you tell anybody what George and Richard Davis did?" (R–385).

Q.  You are sure of that?

A.  I'm positive of that.

Q.  No other names were mentioned, other than yours?

A.  Yes, it was two other names mentioned.

Q.  Well, what other names were mentioned?

A.  George Erwin and Richard Davis.

Q.  What were their names mentioned in regard to?

A.  They said—I can't recall the exact words he said.

Q.  But give us your best recollection?

A.  Well, it sounds like he said that—I can't even recall, I can't even think of what he said.

Q.  Well, did he say George Erwin and Richard Davis implicated you?

A.  I just can't recall what he said to me.

Q.  Well, can you give us the substance of the conversation?

A.  You mean the words, substance, in other words like I told you to the ninth grade (sic).  I don't understand your words.

Q.  I'm sorry.  Any time I use a word, Mr. Goudlock, don't hesitate to ask me what it means, and I will change it so you understand what I am asking you, okay?

A.  Yes.

Q.  You went in there and he gave you your rights?

A.  Yes.

Q.  And you can't recall what else he said to you?

A.  He gave me my rights, and then he told me all the rest.  Then, that's all.

Q.  And that's all?

A.  He said I was involved in a homicide, that's all I can recall.

Q.  When he gave you your rights and told you you can remain silent, etcetera, etcetera, and he said that you were involved in a homicide, right?

A.  You could say that.

Q.  What else did he say?

A.  I can't recall everything he said.  It's been about six months.

Q.  Well, did he mention any names after he said you were involved in a homicide?

A.  He gave me—I personally asked him who I was supposed to be in with, and he told me the two names I just told you.

Q.  And he told you that, what were the two names?

A.  Yes.

Q.  What were they?

A.  Richard Davis and George Erwin.

Q.  Then you were brought to the Detention home?

A.  Yes.

Tr. 328–331.

In additional cross-examination, the prosecutor requested the petitioner to relate his activity from March 8 through March 10 when he appeared at the police station.  In his laborious account, the petitioner failed to mention the act of entering the 1975 Chrysler which led to the following exchange:

Q.  All right.  And at some time you went to bed that night, and you woke up on Thursday, right?

A.  Yes.

Q.  On Thursday, March the 10th, and then you went to John Adams for half an hour, then to Zoe's on Reno, and you came home around 2:00 o'clock in the afternoon after shooting basketball on Lexington, and your mother told you the detective called, and she brought you to the Justice Center.

When did you play in the Chrysler?

A.  When did I play in the Chrysler?

Q.  Yes.

A.  I played in the Chrysler as soon as I came from playing basketball on my way home.

Q.  You forgot to tell me that.

A.  But you didn't ask me that.

Q.  I asked you after every question, but you didn't mention the '75 Chrysler on Bessemer.

A.  It was there.

Q.  You forgot about that, didn't you?

A. No.

Tr. 358.

Then the prosecutor questioned the petitioner at length with respect to his conduct while inside the Chrysler and that questioning was concluded with the following exchange which constitutes the focal point of this case.[9]

Q. A couple of final questions, Mr. Goudlock. When was the first time you told anybody about your playing in that 1975 Chrysler parked on Bessemer?

MR. TOLLIVER: Objection.

THE COURT: Overruled.

A. I didn't tell nobody that I was playing in that 1975 Chrysler.

Q. So, this is the first time that you told anyone since March the 9th, 1977 that you played in that Chrysler?

A. Yes.

9. On redirect, counsel for the defendant began and then abandoned an inquiry about the issue of the timing of the revelation of the petitioner's exculpatory explanation as to the 1975 Chrysler in the following exchange:

Q. And tell the Court and jury, did it come to your attention that your fingerprints were found in the Chrysler?

MR. CARLIN: Objection.

THE COURT: The objection to the question in that form will be sustained. Should we be more specific—

MR. TOLLIVER: Yes, your Honor.

Tr. 399

10. In Doyle, defendant Wood was cross-examined as follows:

Q. [By the prosecutor.] Mr. Beamer did arrive on the scene?

A. [By Wood.] Yes, he did.

Q. And I assume you told him all about what happened to you?

A. No.

Q. You didn't tell Mr. Beamer?

A. No.

Q. You didn't tell Mr. Beamer this guy put $1,300 in your car?

A. No sir.

Q. And we can't understand any reason why anyone would put money in your car and you were chasing him around town and trying to give it back?

A. I didn't understand that.

Q. You mean you didn't tell him that?

Q. Or looked in that Chrysler?

A. Yes, sir.

Tr. 394.

## WOULD A RATIONAL TRIER OF FACT CONCLUDE THAT THE PETITIONER'S EXCULPATORY EXPLANATION OFFERED AT TRIAL WAS DISCREDITED OR IMPEACHED BY THE PETITIONER'S POST MIRANDA WARNING SILENCE?

In Doyle, the prosecutor cross-examined regarding the defendants failure to disclose to the arresting officers the exculpatory conduct he was offering at trial. The prosecutor intended for the trier of fact to infer that if Doyle was telling the truth at trial, he would have disclosed the exculpatory conduct at the time of his arrest.[10] The

A. Tell him what?

Q. Mr. Wood, if that is all you had to do with this and you are innocent, when Mr. Beamer arrived on the scene why didn't you tell him?

Q. But in any event you didn't bother to tell Mr. Beamer anything about this?

A. No, Sir.

Defendant Doyle was cross-examined as follows:

Q. [By the prosecutor.] ... You are innocent?

A. [By Doyle.] I am innocent. Yes Sir.

Q. That's why you told the police department and Kenneth Beamer when they arrived—

A. ... I didn't tell them about my innocence. No.

Q. You said nothing at all about how you had been set up?

Q. Did Mr. Wood?

A. Not that I recall, Sir.

Q. As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of Mr. Beamer, —"I don't know what you are talking about."

A. I believe what I said,—"What's this all about?" If I remember, that's the only thing I said.

A. I was questioning, you know, what it was about. That's what I didn't know. I

Supreme Court held that implicit in the *Miranda* warnings is the assurance that the suspect's invocation of the right to remain silent will not be used against him.

The issue of whether the challenged question violates the rule and spirit of *Doyle* must be considered in the context of the testimony as it had developed at the time the challenged question was put to the witness. In the context of the record, did the challenged question and the defendant's silence, i.e., the failure to tell anyone about the Chrysler, tend to either impeach or discredit the exculpatory explanation? Stated otherwise, would a rational trier of fact believe, under the circumstances as presented by the testimony, that the defendant would have been expected to have advised the investigating officers about his entry into the Chrysler· on the 10th of March, and that his failure to so advise served to impeach or discredit his exculpatory explanation.

It is readily apparent that at the time the petitioner was taken into custody on March 10, both the existence and importance of the 1975 Chrysler were unknown to the investigating officers. The police did not know the identity of the second homicide victim. The police did not have an accurate description of the vehicle connected with Russell's killing as Erwin initially identified the vehicle that the petitioner had been riding in with the man in the trunk as a Buick. At the time of the petitioner's arrest on March 10, and his only confrontation with investigating officers, there would have been no reason for the investigating officers to question the petitioner respecting a Chrysler. More importantly, on the date of the March 10 confrontation, there would have been no reason for Goudlock to have told the officers, to exculpate himself, of the fact that he entered a 1975 Chrysler on the afternoon of March 10, two days after the homicides, for an innocent reason unless he was actually guilty and had been in the Chrysler at the time of the murder. The trier of fact could not draw any inference of guilt from the petitioner's silence regarding the Chrysler on March 10 because, as the trier of fact knew from the evidence, Goudlock's fingerprints had not been found inside the Chrysler until five days later. Thus Goudlock's failure to tell the officers of his having been in the Chrysler for an innocent reason does not impeach the credibility of his testimony in that regard.

No evidence presented during the trial suggests that after March 10 the petitioner was confronted with respect to his fingerprints in the 1975 Chrysler or with the fact that the victim, Russell, owned or operated a 1975 Chrysler, or with the fact that a 1975 Chrysler was in any way a part of the prosecution's case. The record is devoid of any suggestion that the prosecution ever suggested or implied that the petitioner's exculpatory explanation for the presence of his fingerprints in the Chrysler should have been offered to the investigating officers or that his failure to offer the exculpatory information was in any way a discrediting factor with respect to his courtroom exculpatory explanation.[11]

Given the status of the evidence at the time the challenged question was put to the petitioner, it is evident that a rational trier of fact would not have considered the defendant's failure to discuss with anyone, including the police, the fact of having entered the Chrysler on March 10, two days after the homicides, absent any knowledge that the Chrysler figured prominently in the prosecution's case, as either discrediting or as an impeaching admission. Simply put, the challenged question does not come within either the mandate or spirit of *Doyle*.

. . . . .

A. Not until I knew what was going on.

knew that I was trying to buy, which was wrong, but I didn't know what was going on. I didn't know that Bill Bonnell was trying to frame me, or what-have-you.

. . . . ..

Q. All right,—But you didn't protest your innocence at that time?

**11.** Neither the government's opening statement or closing argument is a part of the record submitted.

The judgment of the district court is reversed and the petitioner's application for a writ of habeas corpus is dismissed.