Dennis Russell WATSON,
Petitioner-Appellant,

v.

Ronald C. MARSHALL, Superintendent,
Respondent-Appellee.

No. 85–3388.

United States Court of Appeals,
Sixth Circuit.

Nov. 13, 1985.

Decided Dec. 26, 1985.

Robert S. Catz (argued), Mark H. Shenfield, College of Law, State University, Cleveland, Ohio, for petitioner-appellant.

James A. Carr (argued), Asst. Atty. Gen., Columbus, Ohio, for respondent-appellee.

Before MARTIN, CONTIE and WELLFORD, Circuit Judges.

CONTIE, Circuit Judge.

The defendant, Dennis Russell Watson, appeals to this court for habeas corpus relief pursuant to 28 U.S.C. § 2254 (1966). On appeal, Watson argues that there was insufficient evidence to convict him of murder and that he was denied a fair trial due to ineffective assistance of counsel. In order to evaluate both of these claims, it is necessary to review the evidence and testimony in some detail.

## I.

On May 6, 1981, Eric Ford, a nine-month old child, was brought to Akron Children's Hospital by Dennis Watson for care. On May 30, 1981 Eric died from the injuries discovered, including a trauma wound on the head. Watson was Eric's great-uncle and had been Eric's primary caretaker for less than one month. Watson had become Eric's caretaker after Eric was removed from his mother's home on February 12, 1981. Watson offered to care for Eric who was subsequently placed in Watson's home after investigation by the Children's Services Board. Also in this home were Esther Greer, Watson's common-law wife, and their infant son.

Several days before Eric was taken to the emergency room by Watson, Watson's mother took care of the child and noticed that Eric's leg was swollen. Eric was taken to Dr. Screenivasan for an examination of his leg on May 5, 1981, one day before the fatal emergency room visit. At that time, the doctor did not notice any bruises on Eric and neither did Linda Broaddus, Eric's caseworker, or Watson's mother. Although Dr. Screenivasan's x-rays taken on May 5th did not reveal any abnormalities of the left hip, x-rays taken as a result of the May 6th emergency visit show that both legs had been fractured.

Watson admittedly was the only adult with the child for at least four hours prior to the May 6th emergency room visit, and the only adults with Eric during that day were Watson and Esther Greer. Watson had driven Greer to work at 4:40 p.m., had unsuccessfully attempted to locate a babysitter for the evening, and had then returned home to feed the children. At 8:30 p.m., after Eric had allegedly been put in bed, Watson testified that he heard Eric cough. He checked on Eric about fifteen minutes later and discovered Eric unconscious with blood coming out of his nose and mouth. After notifying his neighbor and Esther, he took Eric to the hospital. Watson has consistently asserted that he does not know what happened to Eric, and he denies having ever hit the child. Rath-

er, Watson testified at trial that the marks on Eric's body simply were not bruises.

Eric was not breathing when he arrived at the hospital and he had bruises on his head, back and legs. A Cat Scan taken of the brain revealed hemorrhaging in the eye grounds. Dr. Timmons, a child neurologist who examined Eric after he was resuscitated, testified that this type of hemorrhaging was "highly suggestive of some type of trauma occurring in just a matter of a few hours" before the Cat Scan was taken. Dr. Timmons testified that the injury could have occurred within four hours and up to twelve hours before the child was brought to the hospital, and that Eric could not have inflicted these injuries upon himself.

The coroner, Dr. Kyriakides, testified that he discovered brain and spinal cord hemorrhaging caused by blunt forced trauma and that Eric could not have inflicted this injury on himself unless he had fallen off a thirty-story building. He further testified that it was "more probable that once this happened, the child within a matter of an hour or two became comatose, became unresponsive."

A pediatric resident, Kenton Pate, was on duty in Akron Children's Hospital on May 6th when Eric was brought to the emergency room. Pate, who had participated in the resuscitation of Eric, testified that he believed that the bruises on Eric's head and arms were "no more than twelve hours old at the very most."

Officer Meyers, who was at Children's Hospital on May 6th, testified that he observed bruises on Eric's arm, forehead and leg. Officer Dearmitt, a juvenile detective of eleven years, testified that on May 7th he observed bruises on both sides of Eric's forehead, on the back of Eric's legs and back. He also testified as to the interview he had with Watson and Greer on May 11th when Watson offered his version of the facts. Officer Dearmitt was present at Eric's autopsy and testified as to his observations there as well.

At trial, Watson's own testimony revealed that he thought Eric had "strange looking eyes" and was "dismayed" by the baby. A couple of days before Eric was injured, Watson explained that "it had started really getting aggravating. Every time you would attempt to move him, he would let out a yell, and for really—anything."

Watson argued that the evidence at trial was insufficient to establish beyond a reasonable doubt that he was the individual that harmed Eric. Specifically, Watson reasons that the witnesses' testimony at trial only supports a conclusion that it was *probable* that the injury occurred within the four hours that Eric was alone with Watson, and therefore there is no evidence to connect him with the homicide. He does not argue that the other elements of the murder charge were unsupported by substantial evidence.

## II.

The due process clause protects the defendant from being convicted of a crime without proof beyond a reasonable doubt of every element of an offense. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In reviewing a conviction to determine whether it can be upheld, the evidence must be viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and the reviewing court must draw "all reasonable inferences consistent with the verdict." *United States v. Orrico*, 599 F.2d 113, 117 (6th Cir.1979). In a federal habeas proceeding, the standard of review to be applied when there is a state court conviction is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (original emphasis). *See also Brown v. Davis*, 752 F.2d 1142, 1144 (6th Cir.1985).

Several doctors testified as to the nature of Eric's injuries and the time frame in which the injuries occurred. All agreed that the injuries were recent, occurring within twelve hours at the outside, or with-

in one or two hours before the child became unconscious. All agreed that these injuries could not have been caused by Eric or another toddler, or by falling out of a crib. Although Watson denied he had ever hurt Eric, he testified that he was the only adult with Eric for at least the four hours before his bringing Eric to the emergency room, that obvious bruises were not bruises and that he found Eric's behavior "aggravating" shortly before the incident occurred.

We believe that viewing the evidence in the light most favorable to the government, a rational trier of fact could have found beyond a reasonable doubt that Watson was the individual who killed Eric. As the state appellate court and the federal district court reasoned, "although the evidence against petitioner is circumstantial, it can only be reconciled with a theory of guilt." (District Court Opinion at 14).

### III.

■ Defendant next argues that he was denied effective assistance of counsel. The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) for establishing a denial of effective assistance of counsel requires that the following be established:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 2064. Therefore, the defendant must not only show that his counsel's performance fell below an objective standard of reasonableness, but that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068.

■ The defendant raises two ineffective assistance of counsel arguments. The defendant first claims that portions of Officer Cihaj's and Officer Dearmitt's testimony [1]

1. The portion of Officer Cihaj's testimony which is objected to reads:
 Q: Prior to talking to Dennis Watson, did Detective Hooper give him his rights?
 A: Yes, he did.
 Q: What was Dennis Watson's response to this?
 A: He got very disturbed and close to being outrageous, and he was very uncooperative.
 Q: What did Mr. Watson say?
 A: He said that he had been read his rights before and he didn't have to answer anything without an attorney, and that he had just—he had already spent time, and that he wasn't going to answer anything.
 Q: He spent time where?
 A: In the penitentiary.
 Q: All right. After he said that, did he give any kind of statement to Detective Hooper?
 A: As far as the incident, no. Not at that time.
 Q: In fact, did Dennis Watson talk to you any more that night?
 A: Not to me.
 Q: Did he ever give a statement that night to Detective Hooper, to your knowledge?
 A: Not to my knowledge.

Q: How would you describe the overall attitude of Mr. Watson that second time when you and Detective Hooper talked to him in terms of cooperation?
A: There was none at all.
The portion of Officer Dearmitt's testimony which is objected to reads:
Q: And can you tell us, what, if anything, Dennis Watson said to you when you approached him?
A: I advised him I had a warrant for his arrest. At this point in time, he was very calm, and made no objections to anything. He walked very calmly to the cruiser. It was a detectives' car, an unmarked car, not a cruiser. He was placed in the back seat of the car, and when we started to leave the address, the only statement was, "I have been expecting you."
Q: After he said "I have been expecting you," was there any other conversation between you and Mr. Watson down at the police station?
A: After we arrived at the station, I asked him if he would like to talk to me again about this matter. He said, "no, just book me."
Q: So, after that, you obtained no other statement from Mr. Watson?

were inadmissible because the testimony related to Watson's decision to not answer questions after being read his *Miranda* rights, violating *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Watson claims that counsel's failure to object to this testimony constitutes ineffective assistance of counsel.

We are of the opinion that we need not reach the merits of the *Doyle* argument because in *Strickland*, the Supreme Court specified that:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

104 S.Ct. 2069–70. In this case we believe that the defendant received a fair trial and cannot reasonably establish that the results of the trial would have been different had these officers' testimony been excluded.

In analyzing prejudicial effect under *Strickland*, it is necessary to examine the record in its entirety. The incriminating aspects of trial in this case were the medical evidence coupled with the defendant's own testimony. Officer Cihaj's testimony was undoubtedly of prejudicial value to the defendant. However, her reference to Watson's having spent time in jail was of little significance since the defendant also testified to this fact. Although her testimony concerning the defendant's response to being read his *Miranda* rights was negative, we are of the opinion that, in light of all the other evidence produced at trial, it did not rise to the kind of prejudice envisioned by *Strickland* and the defendant received a fair trial.

The defendant next claims that his trial counsel should have objected to Officer Dearmitt's testimony relating to child abuse cases.[2]

First, "the mere failure to object to evidence and to jury instructions does not render counsel ineffective." *Lockett v. Arn*, 740 F.2d 407, 412 (6th Cir.1984). Second, even were we to assume that this evidence were clearly inadmissible, this error could not satisfy the *Strickland* test because of the defendant's failure to establish prejudice, particularly in light of the medical evidence produced at trial in this case.

Accordingly, the district court's opinion is AFFIRMED.

WELLFORD, Circuit Judge, dissenting.

While I agree with Judge Contie's opinion that, although circumstantial, there was sufficient evidence in the case to warrant a conviction, I harbor such reservations about certain aspects of the prosecution that I dissent. These reservations concern

---

A: No other statement.
It should be noted again, that the defendant had made a complete statement to Officer Dearmitt on May 11th, prior to his arrest.

2. After Officer Dearmitt testified that it was not unusual for one child in the family to be physically abused and that most child abuse cases do not result in open wounds, he then testified as follows:

> Q: In your experience in dealing with child abuse cases, what are some of the common ways that these bruises occur?
> A: Parents are very clever. They will wrap something around their hand and batter the child, try not to leave marks in case they are of school age. Some could care less, and they just hit them where the clothes would conceal it. Normal abuse ranges from just about anything a parent can devise.

> Q: Have you ever encountered any situation where, let's say, a baby is shook, a little baby is shook?
> A: When I just got involved in this case, I immediately thought of the shake syndrome, where the child is shook so vigorously that the brain is rattled loose in the skull. That is a syndrome that doctors will use, it is the shake syndrome.
> Q: When a little baby is shook, what happens to the brain?
> A: It is—it breaks loose from its contacts with the skull and just rattles, and thereby, pounding on the skull, it hemorrhages from the force used. Normally, on a child that is shaken vigorously, you will get the bruise in the front and in the rear that match the direction that the brain went after it was shook.

not only ineffective assistance of counsel, which may well meet the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), standards, but also actions of the prosecutor that were improper and prejudicial, depriving appellant of a fair trial. If the factual circumstances of guilt in this case were stronger, perhaps the problems might be viewed as harmless error, but in my view the evidence of guilt is not particularly strong and certainly not overwhelming.

The district judge in this case held with respect to appellant's argument of ineffective assistance of counsel:

> Officer Cihaj testified that, after a detective gave him his [*Miranda*] rights, petitioner became upset and uncooperative and stated that he had served some time in a penitentiary.

The officer properly first gave Watson the warning that anything he said to the police might be used against him. Watson made no statement whatsoever about whether or not he had struck or abused the child he had earlier brought to the hospital. Furthermore, he said nothing that was inconsistent with his position of innocence taken at trial. As this court recently noted:

> The Supreme Court held [in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)] that implicit in the *Miranda* warnings is the assurance that the suspect's invocation of the right to remain silent will not be used against him.

*Goudlock v. Marshall,* 751 F.2d 865, 871–72 (6th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 380, 88 L.Ed.2d 334 (1985).

It seems clear to me that the prosecutor in questioning Officer Cihaj knew that Watson had made no statement indicative of guilt or innocence to her after having been warned about his *Miranda* rights. Watson had given no explanation to Officer Cihaj about his conduct during the critical time he was presumably alone with the child. The prosecutor's only purpose was to draw from the officer an alleged admission that Watson "had served some time," and the prosecutor intended to bring that out as a matter of direct proof.[1] It was obvious that this would improperly work prejudice against defendant, who accordingly may have been deprived of his privilege of not testifying. The defendant's attorney should have objected to this ploy by the prosecutor. The officer's response was objectionable not only because she mentioned that Watson said he had "spent time," but also because her use of the word "uncooperative" might well be construed as commenting on Watson's silence, that is, the exercise of his right not to say anything about the potential criminal charge implicating him in the infant Ford's death.[2] The officer, of course, then conceded that Watson gave no statement, amplifying what she meant by his lack of cooperation.

The episode related above is seriously troubling. Not only does it suggest the actions of the prosecutor deprived Watson of a fair trial, but it also reflects the unwillingness or inability of Watson's counsel to cope with the prosecutor's tactics. Moreover, the prosecutor wrongfully pursued this same line by again asking about Watson's "attitude ... in terms of cooperation." The prosecutor knew that, without any objection, Officer Cihaj would respond

---

1. The prosecutor made sure that the jury would understand what "spending some time" meant by improperly pursuing this inquiry:

 Q: "He spent time where?"
 A: "[I]n the penitentiary."

2. Cihaj's response to the prosecutor's improper question "what did Watson say?" was, in essence:

 "... he didn't have to answer anything without an attorney, ... and that he wasn't going to answer anything."

(Eliminating the inadmissible part that "he had already spent time"). Watson's response, then, was a reiteration of the *Miranda* warning and that he was going to remain silent without an attorney present. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Officer Cihaj then later responded to another inappropriate question that Watson did not give "any kind of statement ... as far as the incident, no." The prosecutor knew in asking this question that the witness would be telling the jury *again* that Watson was, in effect, exercising his constitutional right to remain silent.

that "there was none at all"—in other words, he did not make a statement nor give any explanation. Again, there was no objection to this by Watson's counsel.[3]

In my view Watson's counsel also should have objected to the direct testimony, as a part of the State's proof, of Officer Dearmitt which again brought out the same fact of Watson's silence at a later time following his arrest.[4] Dearmitt testified, without objection, that while being booked at the station Watson did not desire to make a statement, that he obtained "no other statement" from Watson. In light of Cihaj's testimony concerning Watson's silence, this further emphasis on Watson's post*Miranda* silence was unconstitutional. In my view the repeated emphasis upon Watson's being uncooperative, and upon his making no statement when advised about his *Miranda* rights deprived Watson of a fair trial.[5]

Whether the actions of the prosecutor and the police witnesses amounted to a violation of *Doyle* is not clear to me. It does not appear that using the narrow *Goudlock* definition of a *Doyle* violation the prosecutor was attempting to use post *Miranda* silence "to impeach or discredit an exculpatory explanation offered by the defendant at trial." *Goudlock*, 751 F.2d at 866. Nevertheless, I cannot condone the conduct of the prosecutor nor feel anything but discomfort at the failure of Watson's counsel, or the court, to prevent what seems to be a serious flaw in the conduct of the case against Watson.

For the foregoing reasons, I respectfully dissent and would direct the State of Ohio to retry appellant or grant him release from custody.

---

**3.** The trial court itself should not have permitted this second "comment" regarding Watson's making *no statement at all.*

**4.** I believe that the series of failures to object herein mentioned do constitute ineffective assistance of counsel under the *Strickland v. Washington* standards by falling below an "objective standard of reasonableness." 466 U.S. at 687–88, 104 S.Ct. at 2065. I believe also that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the

proceeding would have been different," or likely would have been different. *Id.* at 691, 104 S.Ct. at 2068; *see also Hill v. Lockhart,* — U.S. —, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985).

**5.** At another time during the testimony of the police officer, Watson's "uncooperative" attitude was further characterized as "surly." The court sustained an objection to this characterization but the damage may have already been done.